Lane *vs.* Morris.

No. 22.—Richard A. Lane, plaintiff in error, *vs.* Thomas Morris, defendant in error.*

[1.] Where the plaintiff's cause of action is founded on a Statute of this State, the Statute will be considered *in the nature of a specialty*, in regard to the Statute of Limitations, and not barred until twenty years.

[2.] In an action brought by a billholder against a stockholder, under the 11th section of the charter incorporating the Planters' and Mechanics' Bank of Columbus, for the *ultimate* redemption of the bills issued by the bank: *Held*, that the stockholder was only liable to pay interest on the bills from the time of demand of payment thereof, made by the billholder of the stockholder, and not from the time of demand of payment made on the bank.

[3.] In an action by a billholder against a stockholder, founded upon the 11th section of said charter, which declares that the persons and property of the stockholders shall be pledged and held bound in proportion to the amount of shares and the value thereof, which each individual may hold in said bank, for the ultimate redemption of the bills or notes: *Held*, that the value of the stock was to be estimated according to the valuation placed upon it by the second section of the charter, to-wit: one hundred dollars per share.

Debt, in Muscogee Superior Court. Tried before Judge Iverson, May Term, 1851.

This was an action of debt, brought by Richard A. Lane against Thomas Morris, as a stockholder of the Planters' and Mechanics' Bank of Columbus, for the recovery of his *pro rata* liability under the charter, for the redemption of certain bills of the said bank, held by Lane. To this action, Morris, among other things, pleaded, that the right of action was barred by the Statute of Limitations, not having been prosecuted within *four* years after the same accrued to the said Lane. Counsel for Lane demurred to the plea, and moved to strike it out. The Court below overruled the motion, and this is the first ground of error assigned.

It appeared, in evidence, that the amount of stock subscribed in the Planters' and Mechanics' Bank, was *one million of dollars*, in shares of $100 each; that only $25 per share was paid in;

---

*Note.—For former report of this case, see 8 *Georgia Reports*, 468.

Lane *vs.* Morris.

that in April, 1847, suit was brought by Lane upon these bills, against Robert B. Alexander, the assignee of the Planters' and Mechanics' Bank, in which it was averred that a demand was made upon said bank for payment of the same, on 25th April, 1842. On 1st February, 1848, Robert B. Alexander, the assignee, confessed judgment "to the plaintiff, for the sum of $1,925, with interest and costs, to be levied of the goods and chattels, rights and credits, lands and tenements of the said Planters' and Mechanics' Bank of Columbus." On this judgment execution issued, upon which the Sheriff made return of *nulla bona*, on 17th March, 1848.

Plaintiff's counsel requested the Court to charge, "that if they should find for the plaintiff, he was entitled to interest on the amount of his bills, from the time of the demand on the bank, to the return of *nulla bona* on the *fi. fa.* and from that time interest on the proportion for which the defendant was liable." The Court declined so to charge, but instructed the Jury as follows: " That the plaintiff was entitled to recover interest on the proportion of the bills held by plaintiff, from the time of the return of *nulla bona* upon the *fi. fa.*"

This charge and refusal to charge, are assigned as grounds of error.

The counsel for plaintiff requested the Court further to 'charge the Jury, " in estimating the *value* of defendant's stock, (in order to arrive at the amount of his liability under the charter,) they should be governed by the estimate or value fixed by the charter, viz: $100 per share, and not by the market value, or the amount paid in." The Court declined so to charge, but instructed the Jury as follows: " That, in order to ascertain the *pro rata* proportion due by the defendant, that the *value* of the stock was to be estimated by the amount proven to have been paid in."

This charge and refusal to charge are also assigned as grounds of error.

W. Dougherty, for plaintiff in error.

B. HILL and COLQUITT, for defendant.

*By the Court.*—WARNER, J. delivering the opinion.

The plaintiff's action of debt is founded on the 11th section of the Act of the Legislature, incorporating the Planters' and Mechanics' Bank of Columbus, which declares, that " the persons and property of the stockholders shall be pledged and held bound, in proportion to the amount of shares and the value thereof, that each individual or company may hold in said bank, for the *ultimate* redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt, and no stockholder shall be relieved from such liability by sale of his stock, until he shall have caused to have been given sixty days' notice in some public gazette of this State." *Prince,* 127.

To the plaintiff's action, the defendant pleaded the Statute of Limitations of four years, which the Court below sustained, and the plaintiff excepted, and now assigns the same for error in this Court.

[1.] The question is, was the plaintiff's right of action barred by the Statute of Limitations? In order to determine this question, we must first ascertain the exact position which the plaintiff's demand occupies, with regard to that Statute. Is the plaintiff's demand founded upon an open account, for the recovery of unliquidated damages, or is it founded upon a statutory liability, which is to be regarded in the *nature of a specialty?* Is the liability of the defendant created by *contract,* either express or implied, or is it a liability created by the express enactment of the law? If the liability of the defendant to pay the bills of the bank, is founded upon any *"lending or contract,"* then the Statute applies and protects him; but if his liability for the ultimate redemption of the bills is not founded " upon any lending or contract," but is created by the *express enactment of the law* then the Statute of Limitations of four years, as ruled by the Court below, does not apply and afford him protection, for the reason that the plaintiff's action being grounded on an Act of the Legislature,

which is the *highest record*, is not within the Statute, unless there is something in our own legislative enactments which take it out of the rule, as above stated.    To sustain the position that an action of debt, founded upon a *statutory liability*, has never been considered as being within the Statute of Limitations of 21*st James I. chap.* 16*th, of England*, or of the like Statutes in this country, but that such statutory liability has always been regarded in the *nature of a specialty*, the following authorities may be, in our judgment, most confidently relied on : 6*th Bacon's Abridgment, new edition*, 377, *letter D.    Limitation Personal Actions.    Angel on Limitations*, 82, 83.    *Ballantine on Limitation of Actions*, 88.    *Comyn's Dig.* 413,    *Temps. G.* 15.    *Talory vs. Jackson,* (*Croke Car.* 513.)    *Jones vs. Pope,* (1 *Saunders' Rep.* 37.)    *Pease vs. Howard,* (14 *John. Rep.* 480.)    *Bullard vs. Bell,* (1 *Mason's Rep.* 243.)    *Griffin vs. Heaton,* (2 *Baily's R.* 58.)    In *Ward vs. Ruder,* (2 *Harr. & McH. Rep.* 154,) the Court said: " An action grounded *upon a Statute*, cannot be barred, such as debt for an escape, &c."

There can be no doubt that the liability of the defendant, as a stockholder, for the ultimate redemption of the bills of the bank, is created by the 11th section of the Statute, incorporating the Planters' and Mechanics' Bank of Columbus ; without that section in the Act, he would not be liable to the plaintiff, as a holder of the bills of the bank.    Having ascertained, then, that the plaintiff's cause of action against the defendant, is grounded on a *statutory liability*, and that such statutory liability has always been considered in the nature of a *specialty*, and not within the Statute of Limitations of 21*st James in England*, nor within the Statutes of Limitations of this country, containing the same or similar provisions, we will now proceed to examine the legislation of this State in regard to that subject, and see wherein our own Statute of Limitations differs from that of the English Statute of *James*, in reference to this question.

The first Statute of Limitations which we find upon our Statute book, was passed in 1767.    *Prince,* 573.    On the 7th Dec. 1805, the Act of 1767 was repealed, and an Act prescribing a different rule for the limitation of actions in this State was adopt-

ed. *Clayton's Dig.* 269. By the Act of 26th June, 1806, the Act of 1767 was declared to be in full force, as to all actions and causes of action, which originated under it. *Clayton's Dig.* 303. And by the Act of 8th December, 1806, the first Act of 1767, was fully revived and declared to be in full operation, as the Statute of Limitations of this State, except as provided in the second section of the Act of the 8thDecember, 1806, which section relates to the removal of certain disabilities mentioned therein, and to the limitation of actions on *notes and instruments of writing not under seal.* By the 3d section of the Act of 8th Dec. 1806, it is declared, "that all Acts or parts of Acts, which militate against the intent and meaning of this Act be, and the same are hereby *repealed.*" *Clayton's Dig.* 344. The Statute of Limitations, then, of 1767, is declared to be of force; and all Acts or parts of Acts which militate against that Act, or are repugnant to its provisions, are expressly *repealed* by the Act of 8th Dec. 1806. The position of the defendant in error is, that the statutory liability of the defendant being in the nature of a *specialty,* the 2d section of the Act of 1805 applies to it, and bars the plaintiff's action ; and that this portion of the Act of 1805, relating to specialties, is not repealed by the Act of 8th December, 1806, reviving the Act of 1767. The second section of the Act of 1805 declares, "that all actions of debt, whether upon *specialty or simple contract,* (other than upon judgments,) shall be commenced and sued within four years next after the cause of action hath occurred, and not after." *Clayton's Dig.* 270. What *class* of specialties did the Legislature contemplate should be barred in four years? Did the Legislature of 1805 contemplate that actions of debt on a *statutory liability,* which is in the *nature of a specialty,* should be barred in four years, or did the Legislature contemplate such actions of debt as were founded on *special contracts under seal* ? That the Legislature contemplated the latter class of *specialties,* we think is quite clear, from the words employed. The Act of 1805 declares, " that all actions of debt, whether upon *specialty or simple contract,* shall be barred in four years." That is to say, all

Lane *vs.* Morris.

actions of debt, whether upon *specially contracts* or *simple contracts*, shall be barred in four years. The word "specialty," was used in its *legal* sense, by the Legislature. What is a debt due by *specialty?* Debts due by specialty, or special contract, are such, whereby a sum of money becomes or is acknowledged to be due by deed, or *instrument under seal.* 2 *Bl. Com.* 382. *Bouviere* defines a " specialty contract," to be a writing, sealed and delivered, containing some *agreement.* If the instrument be really *sealed,* it is a " *specialty,*" and if it be *not sealed,* it is " *not a specialty,*" although the parties in the body of the writing, make mention of a seal. 2 *Bouviere's Law Dictionary,* 521. It was evidently actions of debt upon *contracts under seal,* as well as *simple contracts,* that the Legislature intended to bar in four years, when the term "specialty" was used in the Act of 1805, and not actions of debt founded *on Statutes,* which are not *technically* " specialties," but are considered in the *nature of specialties only.* In legal contemplation, a " specialty" is an instrument *under seal,* and an *instrument under seal,* is a " *specialty,*" and when used by the Legislature in relation to the subject matter of the limitation of actions upon *contracts,* the term must receive its appropriate legal meaning. The word " bond," *ex vi termini,* imports a *sealed* instrument. 1 *Bouviere's Law Dictionary* 218. By the 25th section of the Judiciary Act of 1799, the words " *bonds and other specialties,*" contemplate *contracts under seal.* The word " *specialty*" in the Act of 1805, also contemplates the same class of *contracts,* as were embraced in the words " *bonds and other specialties,*" in the Act of 1799. *Prince,* 246.

But if we should be in error in regard to this point, and the Act of 1805 intended to embrace actions of debt founded upon *Statutes* under the term " specialty," and not actions of debt founded upon *contracts under seal,* then we hold, that the Act of 1805 was *repealed* by the Act of the 8th December, 1806, reviving the Act of 1767. By the 5th section of the Act of 1767, it is declared, " That all actions of debt, grounded upon any lending or contract, *without specialty,* shall be commenced and sued within four years next after the cause of such actions or

suits, and not after." *Prince,* 575. The Act of 1805 limits all actions of debt, whether upon *specialty* or simple contract, to four years. The Act of 1767, which was revived in 1806, declares, that all actions of debt, grounded upon any lending or contract, *without specialty,* shall be barred in four years. The Act of 1805 *embraces specialties;* the Act of 1767 *excepts specialties,* from its operation. When the Legislature, in December, 1806, re-enacted the Act of 1767, which *excepted specialties* from its operation, and repealed all Acts or parts of Acts which militated against the provisions of the latter Act, so much of the Act of 1805, as *included specialties* within its operation, was necessarily repealed; for the latter Act, which *included specialties,* militated against the Act of 1767, which *excluded them.*

If it was the intent and meaning of the Act of 1805, to *include* actions of debt founded upon Statutes, because Statutes were specialties, then it was most clearly the intent and meaning of the Act of December, 1806, in reviving the Act of 1767, to *exclude* all actions of debt founded upon Statutes, under the name of "specialties," for specialties are *expressly exempted* from the operation of that Act. The Act of 1805, *including* actions of debt upon specialties, and the Act of the 8th December, 1806, reviving the Act of 1767, expressly *excluding* actions of debt on specialties, the last Act must prevail, which we hold *repeals* the Act of 1805, even if actions of debt, founded upon *Statutes,* were intended to have been included in the latter Act. In the case of *Branch Bank of Alabama vs. Kirkpatrick,* (5 *Ga. Rep.* 38,) we held, that the Act of 1805, was not repealed by the Act of 8th December, 1806, reviving the Act of 1767, so far as it regarded suits on *foreign judgments,* for the reason there was no *repugnancy* between the two Acts on that subject, *judgments* not being mentioned in the Act of 1767; therefore the Act of 1767, as revived, did not militate against the Act of 1805, in respect to *foreign judgments;* but in regard to actions of debt on *specialties,* we have shown, that there is a *repugnancy* between the two Acts, the one *including* specialties, the other *excluding* them; thereby showing a different *intent and meaning* on the part of the Legislature, on the 8th December, 1806, than

that manifested in 1805, in regard to actions of debt on *specialties*.

The next Act which we shall notice, is that of 13th December, 1809, which limits all actions founded on *bonds or instruments under seal*, to twenty years ; all actions founded upon *notes* and other acknowledgments under *the hand of the party*, to six years, and all actions founded on *open accounts*, to four years. *Prince*, 577.

Although bonds and instruments under seal are, in legal contemplation, *specialties*, yet it may be said, that the Act of 1809 is only applicable to a *particular class* of specialties, to wit : bonds and instruments under seal, and does not include actions of debt on Statutes or domestic judgments, which are not, *technically*, specialties, but only in the *nature of specialties*. Taking this view of the Act of 1809, what is the result of our own legislative enactments in regard to the limitation of actions of debt, founded upon a statutory liability ? If the Act of 1805 was intended to embrace actions of debt founded on a statutory liability, because Statutes were in the *nature* of " specialties," then the Act of 1805 being repealed by the Act of the 8th December, 1806, which revived the Act of 1767, by which latter Act of 1767, all actions of debt on " specialties" were *excepted* from its operation ; and if actions of debt, founded upon Statutes, are not embraced in the Act of 1809, the result is, that there is no Statute of Limitations of force in this State, which limits the action of debt founded on Statutes, any more than there is in regard to actions of debt on domestic judgments. Actions of debt founded upon Statutes and domestic judgments, being in the nature of specialties, are excepted from the operation of the Act of 1767, and occupy the same position in regard to the Statute of Limitations, as at the Common Law, which presumed a specialty to have been paid after the expiration of twenty years.

The fifth section of the Act of 1767, does not bar *every action of debt* in four years, but only such actions of debt as are " *grounded upon any lending or contract without specialty.*" Taking into consideration, then, that the Legislature, by the Act of

VOL X   22

1809, have extended the limitation of *all actions* on bonds and instruments *under seal*, to twenty years, thus clearly expressing their intention as to that particular class of specialties, and also prescribing the term of *six years* as a bar to actions on notes and other instruments under the hand of the party, can it be presumed, for one moment, that the Legislature intended, by the several enactments to which we have referred, to place actions of debt, founded on *Statutes* and on *domestic judgments*, on the same footing with *open accounts*, in regard to the Statute of Limitations? We shall not attribute any such intention to the Legislature, in the face of the Act of 1767, for that would be to say, that the Legislature intended to place debts of the *highest dignity*, supported by the *highest evidence* known to the law, upon the same footing as the *lowest* grade of debts, and to be barred within the *shortest* period of time prescribed by that Statute. There is nothing then, in our own legislative enactments upon this question, which takes this case out of the rule, (so conclusively established by the authorities before cited,) that actions of debt founded upon Statutes, which are regarded in the *nature of specialties*, are not within the provisions of the English Statute of 21st *James*, nor the provisions of the like Statutes of Limitation in this country. This rule which was applied to the construction of the Statute of 21st *James*, by the Courts in England, prior to the Revolution, is *particularly* applicable to the construction of our Act of 1767, which is, except as to time, nearly an exact transcript from the English Statute of 21 James.

What rule of limitation shall be applied to actions of debt founded upon *Statutes* and *domestic judgments*? The answer is, the rule of the Common Law, which presumes payment or satisfaction, after the lapse of twenty years. *Angell on Lim.* 95. 1 *Greenlf. Ev.* 46, §39. The time prescribed by the rule of the Common Law for presuming payment or satisfaction of specialties and judgments, is analogous to the time prescribed for the limitation of actions on bonds and instruments under seal, by the Act of 1809. The intention of the Legislature to limit actions on specialities, is declared, in that Act, to be twenty years, and by analogy we hold, that actions of debt founded on Stat-

utes or domestic judgments, being in the nature of specialties, must also be barred in twenty years, and not within a shorter period of time.

[2.] The next question made in the record is, as to the lia-- bility of the defendant as a stockholder, to pay *interest* on the bills of the bank held by the plaintiff.

The Court below held, that the defendant was only liable to pay interest on the bills from the time of the return of *nulla bo- na* by the Sheriff on the *fi. fa.* issued on the judgment obtained against the corporation; to which ruling of the Court the plain- tiff excepted, and now insists before this Court, as he did in the Court below, that the defendant is bound to pay interest on the bills from the time of the demand of payment thereof made on the bank, and not from the time of the return of *nulla bona* on the *fi. fa.* by the Sheriff. In our judgment, the plaintiff, as a billholder, is not entitled to recover interest on his bills against the defendant, as a stockholder, from the time of the demand of payment made on the bank, nor from the time of the return of *nulla bana* made on the *fi. fa.* issued on the judgment obtained against the bank or its assignee, but only from the time of a de- mand made by the billholder upon the stockholder, for the pay- ment of the bills. By the 11th section of the charter, the de- fendant, as a stockholder, is only bound for the *ultimate* redemp- tion of the bills, that is to say, after the assets of the bank and the capital stock thereof have been exhausted. The remedy of the billholder against the stockholder is not through the corpora- tion. Whenever the state of facts exists, which will authorize the billholder to call upon the stockholder for the *ultimate* re- demption of the bills, his remedy, under the 11th section of the charter, is *directly* against the stockholder, and the stockholder is not to be considered in default, in not making payment, until a demand is made upon him, for the reason, he does not know who is the holder of the bills of the corporation. But it was insisted, on the argument for the plaintiff in error, that it was the duty of the stockholder to come forward and pay up the amount for which he is bound to pay under the charter, if he desires to avoid the payment of interest. To whom shall he

make payment? Shall he make payment to the insolvent corporation, or its assignee? Probably he has already paid as much money there, in the way of stock, as he chooses to entrust in such hands. In every view which we have been able to take of this question, we are of the opinion, that the stockholder is only liable to pay interest from the time of the demand made upon him by the billholder—there being no demand proved in this case prior to the commencement of the plaintiff's suit, he is not entitled to recover interest only from that time.

[3.] The third assignment of error is to the charge of the Court, as to the *value* of the stock held by defendant. The Court charged the Jury, that in order to ascertain the *pro rata* proportion due by the defendant, that the value of the stock was to be estimated by the amount *proved to have been paid in on the same*, and not by the nominal value of one hundred dollars per share, as fixed by the charter, to which charge the plaintiff excepted. This is an action by the billholder against the defendant as a stockholder, to make him liable for the *ultimate* redemption of the bills issued by the Planters' & Mechanics' Bank of Columbus, in proportion to the amount of shares which he held in that bank, and the question is, as to what is to be the *estimated value* of the shares of stock so held by him? This question must be decided by reference to the Act of the Legislature granting the charter. By the Common Law, the defendant, as an individual stockholder, would not have been liable for the redemption of the bills issued by the bank, and he is now only liable to the extent which the Statute incorporating the bank declares he shall be so liable. The second section of the charter enacts, that " the stock of the company shall consist of *one million of dollars, in shares of one hundred dollars each.*" By the sixth section of the charter, the corporation is authorized to issue bills or notes to three times the amount of their capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safe keeping. By the 11th section of the charter, it is declared, " The persons and property of the stockholders, shall be pledged and held bound, in proportion to the *amount of shares* and the *value* thereof, that each individual

or company may hold in said bank, for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt." There are certain well established rules to be observed in the construction of Statutes. One rule is, that one part of a Statute must be construed by another part of the same Statute, that the whole may, if possible, stand. Another rule is, that words used in a Statute, are always to be understood as having a regard to the subject matter thereof, for that is always supposed to be in the eye of the legislator, and all his expressions directed to that end. Words and phrases, the meaning of which has been ascertained in a Statute, are, when used in a subsequent Statute, or in subsequent parts of the same Statute, to be understood in the same sense. 1 *Institutes*, 381. 1 *Bl. Com.* 41. *Salk.* 609. Taking these rules for our guide, we will now proceed to consider what the Legislature intended by declaring, that " The persons and property of the stockholders should be pledged and held bound in proportion to the amount of shares, and the value thereof, that each individual might hold in said bank, for the ultimate redemption of the bills or notes issued by said bank."

The Legislature granted to this company the privilege of banking on a capital stock of one million of dollars, which was divided into shares of one hundred dollars each. The capital stock of the bank is definitely settled by the several sections of the charter, and is divided into shares. Did the Legislature leave the value of each share to be taken by the stockholders *indefinite* and *uncertain*, to be determined by the amount which might be paid in on each share, or the market value thereof? Certainly not, for the second section declares, that the stock of the company shall consist of one million of dollars, in shares of *one hundred* dollars each. This section contemplates the *value of each share* taken by the stockholders, at the time of subscribing therefor, to be *one hundred dollars*. The same section provides, that before the board of directors shall be permitted to issue bank notes, the stockholders shall pay twenty-five per cent. on the amount of their capital stock. How much would each stockholder be required to pay, to meet this assessment of twen-

ty-five per cent. under the charter, to enable the corporation to issue bank notes? The answer is, twenty-five dollars on each share. Why? Because the charter has fixed *the value* of each share of the capital stock of the bank at *one hundred dollars*, and the payment of twenty-five dollars would be twenty-five per cent. on that amount. We think there can be no doubt, that the capital stock of the company was one million of dollars, and that it was divided into shares of one hundred dollars each, and that for all the purposes connected with the grant made to the company, each share was considered of *the value of one hundred dollars*, by the Legislature. By the sixth section of the charter, the company were authorized to issue bills, or notes, to three times the amount of their capital stock actually paid in. If the stockholders paid in the one million of stock for which they subscribed, in shares of one hundred dollars each, then, the company might issue three million of bills or notes. Here it is important to bear in mind, that the privilege was granted to the company by the Legislature to pay in all the capital stock, and to issue bills to three times that amount. It is true that by the second section of the charter, the company might commence issuing their bank notes when twenty-five per cent. on the amount of their capital stock was paid into the bank in specie; but whether the company would do so, or require the full amount of the stock to be paid in, was at their option. The Legislature granted to the corporation the privilege to bank upon a capital of a million of dollars, and to issue bills, or notes, to three times that amount. Now in making this grant to the company, the Legislature must be understood as intending to protect the public from any injury, which might result from the exercise of the *entire* privilege granted to them, to the extent provided in the charter.

The Legislature could not have anticipated what amount of the stock subscribed by the stockholders would be paid in, nor what would be the market value of it when paid in. The Legislature knew that they had granted the privilege to this company to subscribe for stock to the amount of one million of dollars, in shares of one hundred dollars each, and when paid in, to

Lane *vs.* Morris.

issue three millions of dollars in bills or notes; and in view of the privilege thus granted, they intended to give an *additional security* to the holders of such bills or notes, to that which existed at Common Law. But for the 11th section of the charter, the remedy of the billholders would have been limited to the assets of the bank and the capital stock thereof subscribed by the stockholders. That section however, gives them an *additional* remedy, by declaring that "the persons and property of the stockholders, shall be pledged and held bound in *proportion to the amount of shares,* and *the value there*~~of, that each individual~~ or company may hold in said bank, fo~~r the ultimate redemp~~tion of the bills or notes issued by said ban~~k, in the same manner as~~ in common actions of debt." The ar~~gument for the plaintiff~~ in error is, that the stockholders are boun~~d for the ultimate redemp~~tion of the bills, without regard to the ~~amount which may have~~ been issued by the bank. If the words ~~and the value thereof~~" had been omitted in the 11th section, we will not say that his position would not have been well founded; but the words are there, and very *significant* words too, as it regards the rights of the stockholder. He is made liable for the ultimate redemption of the bills just so far as the Statute makes him liable, but no further. If the Statute had declared that the persons and property of the stockholders should be pledged and held bound, in proportion to the *amount of shares* held by each individual in said bank, for the ultimate redemption of the bills issued by the bank, a different rule of liability might obtain; but such are not the words of the 11th section of the charter. The stockholders are *not bound* beyond the amount of their respective shares and *the value thereof,* any more than the securities on a Sheriff's bond would be bound for his default in an amount exceeding the *penalty thereof.* While the words, "and the value thereof," limit the personal liability of the stockholder beyond *the value* of the number of shares held by him, the same words protect the rights of the billholder, and make the stockholder liable to him, just to the extent of the *number of shares* held by him, and the *value thereof.* The stockholder's personal liability to the billholder is

in proportion to the *amount or number of shares* held by him in the bank, and the *value thereof;* no more and no less.

The 6th section of the charter makes the *directors* liable for an excessive issue of bills, in their private and individual capacities, but does not affect the stockholders. One hundred dollars is the value which the Legislature placed on each share of the capital stock, in the second section of the charter, and when they speak of the *value* of the stock in the 11th section, they must intend the same value, as stated in the second section, unless a *different value* had been stated ; upon the principle that words and phrases, the meaning of which has been ascertained in a Statute, are, when used in a subsequent Statute, or in subsequent parts of the same Statute, to be understood in the same sense. We cannot say, that the stockholders are bound for the ultimate redemption of the bills of the bank, in proportion to the amount of their respective shares, according to the amount of stock "*proved to have been paid in by them,*" or according to the *market value of the stock at any given time,* without an interpolation of words upon the Statute, which we do not feel authorized to make. Why should we go *outside* of the charter, to ascertain the value of each share of the stock, when the second section declares that each share shall be *one hundred dollars ?* The fair construction of the charter in regard to this question is, in our judgment, that the Legislature intended to give to the billholders, the *additional* security of making the stockholders liable for the ultimate redemption of the bills or notes issued by the bank, in proportion to the amount or number of shares each stockholder held therein, according to *the value thereof,* as specified in the second section of the charter, (to wit, one hundred dollars to each share ;) that is *the value,* at which the Legislature estimated each share of the capital stock, for the purposes of the charter, at the time of granting it ; and the stockholders are bound for the ultimate redemption of the bills of the bank, in proportion to the amount or number of shares they may respectively hold therein, and the value thereof, as recognized by the same Act, which creates their liability. In the second section of the charter, the Legislature had estimated each share of the capital stock at *one*

*hundred dollars.* In the 11th section of the charter the *subject matter* of legislation is, in regard to *the shares* of the stockholders, and *the value thereof;* the value of the shares of stock was not mentioned in the 11th section, for the simple reason, we suppose, that having declared in the second section, each share should consist of *one hundred dollars,* it was unnecessary to repeat it. The whole Act must be taken together, and when it is declared in the 11th section, that the persons and property of the stockholders shall be pledged, and held bound for the *ultimate* redemption of the bills or notes issued by the bank, in proportion to the *amount of shares,* and the *value thereof,* the stock must be estimated at one hundred dollars each share, for the reason that is the estimate which is fixed by the charter, and *no other estimate* of the value of a share of the capital stock is mentioned in the charter.

In the construction which we give to the charter, full effect is given to the words in the 11th section, " *and the value thereof.*" These words were not only intended for the benefit of the billholder, but were also intended for the *protection* of the stockholder.

If the bank had in circulation three millions of bills and notes at the time of its failure, the stockholders could not be made *personally* liable for the ultimate redemption of such bills or notes beyond the amount of stock subscribed by them, estimating each share at one hundred dollars, as declared in the second section of the charter, for the reason, that is the *exact measure* of their personal liability, as provided in the 11th section. The words "and the value thereof," as applicable to their personal liability, for the ultimate redemption of the bills, in proportion to the respective shares of stock held by them, are important words for their protection, in the event there should be a larger amount of bills in circulation, unredeemed, than the amount of the capital stock of the bank. The stockholders are not made personally liable for the ultimate redemption of *all the bills* which may have been issued by the bank, without any *restriction* by the 11th section of the charter, but are made personally liable only, in proportion to their *respective shares of stock,* " *and the value there-*

*of*," as regulated by the second section of the Act, which is one hundred dollars per share. To that extent, their persons and property are pledged and held bound for the ultimate redemption of the bills or notes issued by the bank, because the 11th section of the charter expressly declares they shall be so held bound, and that is the additional security which the Statute gives to the billholder, which he did not have at Common Law.

Let the judgment of the Court below be reversed.