WILTON B. MARTIN, Plaintiff in Error, *vs.* THE CENTRAL TRUST COMPANY OF ILLINOIS, Defendant in Error.

*Opinion filed December 21, 1927.*

1. ADMINISTRATION—*purpose of section 10 of the Wills act as amended in 1909.* In accordance with the universal policy of the law to preserve local assets for the satisfaction, in the first instance, of local claims, the purpose of section 10 of the Wills act, as amended in 1909, is to protect local creditors living in Illinois in the collection of their debts against non-resident deceased debtors, and it does not compel administration of estates of non-residents where they owe no debts and where administration is unnecessary.

2. SAME—*heirs may settle estate without administration.* Although the purpose of the Administration act is to facilitate the early settlement of estates, administration is not always necessary, and it is competent for all the heirs, if of age, to settle and pay the debts of the deceased and divide the property among themselves without any administration whatever, and neither a debtor nor a creditor has a right to complain.

3. SAME—*when bonds are specialty debts within meaning of section 10 of Wills act.* Railroad and public utility bonds, which are negotiable, being under seal and payable to bearer, are specialty debts within the meaning of section 10 of the Wills act, and when in the hands of an Illinois trust company as collateral security for a loan to a deceased non-resident they are properly inventoried as property belonging to the estate in Illinois.

4. SAME—*situs of shares of stock is not where the certificates happen to be.* As certificates of corporate stock are only evidence of ownership of the shares and the interest of property represented by the shares is held by the company for the benefit of the owner of the certificates, the situs of shares of corporate stock is in the State of incorporation, regardless of where the business and offices are located; and while, for purposes of administration, the situs of corporate shares may be at the domicile of the owner of the shares, in no case can such situs be said to be at the place where the certificates happen to be, as where they are deposited as collateral in another State.

5. SAME—*when foreign executor is not estopped to question inventory in Illinois.* Where a non-resident testator appoints his brother, residing in Illinois, and an Illinois trust company, as executors of his will, the brother, who is the only party competent to act as executor in the State of the deceased's residence, is not

estopped to question the inventory of the trust company as ancillary executor of property in Illinois because he joined in the petition for appointment as ancillary executor and signed the inventory, where he at all times maintained that the inventory could not include certain shares of stock as assets in Illinois and made a statement to that effect after his signature to the inventory, and where the petition for letters ancillary merely stated the facts and contained no statement that the shares were assets in Illinois.

6. SAME—*how fees to joint executors should be allowed.* The reasonableness of the commission to an executor depends upon the circumstances of each case, and fees to joint executors should be allowed jointly unless one of them waives or relinquishes the right to fees, in which case, if both executors have performed services for the estate, the executor charging fees should be allowed his or its just proportion of the total fees allowable.

7. SAME—*when Supreme Court is not bound by finding of Appellate Court as to executor's fees.* Where the circuit and Appellate Courts have affirmed an order of the probate court overruling objections of a foreign executor to the final report of the ancillary executor in Illinois, the finding of the Appellate Court on the question of the reasonableness of the fees allowed the ancillary executor is ordinarily binding on the Supreme Court; but where the only evidence as to the reasonableness of fees is testimony showing that a reasonable fee does not exceed three per cent, the approval of a fee of $1100 is not warranted where the Supreme Court holds there is only $16,600 of personal assets in Illinois, and the finding as to fees may be reversed on the question of law as to whether there is any evidence to support it.

8. WORDS AND PHRASES—*meaning of the word "specialty."* The word "specialty," in its technical signification, imports an instrument under seal for the payment of money.

9. CORPORATIONS—*nature of shares of stock in a holding company—situs.* A stockholder in a holding corporation is not a stockholder in the companies whose stock is owned by the holding company, but the interest of such stockholder in the holding company is similar to the interest of a stockholder in any other corporation, and the situs of shares in the holding company is at the place of such company's incorporation.

WRIT OF ERROR to the Second Division of the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. LEE W. CARRIER, Judge, presiding.

W. T. ALDEN, (CHARLES MARTIN, of counsel,) for plaintiff in error.

FISHER, BOYDEN, KALES & BELL, (WALTER L. FISHER, and THOMAS L. MARSHALL, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Wilton B. Martin, co-ancillary executor with defendant in error, the Central Trust Company, of the last will and testament of Samuel K. Martin, deceased, filed objections in the probate court of Cook county to the final report of the Central Trust Company as co-ancillary executor. The probate court overruled the objections, approved the report and allowed the Central Trust Company $1100 as co-ancillary executor's fees. On appeal to the circuit court of Cook county a like order was entered. The Appellate Court for the First District affirmed the judgment of the circuit court, and this court granted a petition for writ of *certiorari* to the Appellate Court.

The facts proved and stipulated in the record are the following: Samuel K. Martin, a resident of New York, died testate on June 11, 1919. By his will he directed the payment of his debts and funeral expenses, bequeathed $10,000 to the trustees of Princeton University, $1000 to the Ivy Club of Princeton, and devised and bequeathed the remainder of his estate to his widow and two minor sons. The bequests and devises to his sons were in trust. He named his brother, Wilton B. Martin, a resident of Chicago, and the Central Trust Company of Illinois, executors of his will and trustees for his two minor sons. His will was duly admitted to probate in the surrogate court of New York and Martin was appointed by that court as sole executor, as the Central Trust Company was not qualified under the laws of New York to act as executor and it did not qualify as trustee. Previous to his death Samuel K. Mar-

tin had borrowed $35,000 from the Central Trust Company and had executed his two promissory demand notes to it for $11,000 and $24,000, respectively. He had deposited with the trust company, as collateral security for the loan, certificates for 225 shares of the preferred stock of the Metropolitan Gas and Electric Company, a Delaware corporation, of the par value of $100; certificates for 100 shares of the first preferred stock of the Union Gas and Electric Company, also a Delaware corporation, of the par value of $100; five bonds of the Pine Bluff and Western Railroad Company, an Arkansas corporation, of the par value of $1000 each; five bonds of the Michigan City Gas and Electric Company, an Indiana corporation, of the par value of $1000 each; and five bonds of the Galveston, Harrisburg and San Antonio Railroad Company, a Texas corporation, of the par value of $1000 each. Under the signature of Samuel K. Martin to each of the two notes it is recited that he has deposited with the trust company, as collateral security for the payment of the notes and all other liabilities of any kind by him to the trust company, due or to become due, the certificates of stock and bonds aforesaid, and the trust company or its assigns, at all times and without demand of payment, is given full power and authority to sell, assign and deliver the collateral, or any part thereof, at public or private sale, without advertising the same and without giving notice to Martin. In case of sale the proceeds thereof, after payment of costs and expenses, including reasonable attorneys' fees, may be applied upon any liability to the trust company, and the surplus, if any, shall be paid to Martin or his assigns. This contract under the notes was also signed by Martin. The notes and collateral were held by the trust company at the time of the death of Martin.

The bonds aforesaid are negotiable securities, are under seal and payable to bearer. The corporations issuing the

327—40

certificates for preferred stocks were Delaware corporations organized as holding companies for the purpose of holding the corporate stocks of operating companies organized under the laws of Texas, Louisiana, Arkansas, Washington, Indiana and other States. The holding companies transacted no business in Delaware except the holding of stockholders' meetings. Their offices where their business was actually transacted were in Chicago, at which place directors' meetings were held, all books kept and all financing done and dividends paid. The officers were residents of Illinois, and the Central Trust Company was sole transfer agent. Neither corporation was licensed to do business in Illinois. The interest on the bonds and dividends on the stock, amounting to $625, up to June 7, 1920, was collected by the trust company as the holder of the collateral security and not as executor. The remainder of the interest, amounting to $1475, was collected by the trust company as co-ancillary executor. The notes of the testator held by the trust company were paid by Martin as New York executor on June 7, 1920, who then demanded the stocks and bonds, but the trust company refused to surrender them and insisted that its duty was to retain the property as co-ancillary executor in Illinois. A written demand by Martin for the property was made on February 15, 1921, which was refused, and Martin subsequently brought an action of trover in the circuit court of Cook county against the trust company for conversion of the stocks and bonds. Martin, as sole executor in New York, had filed an inventory of the estate in the surrogate court of New York, in which he had listed these certificates of stocks and bonds as assets of the estate in New York. That court is the court having jurisdiction of the probate of wills and the administration of estates in New York and it approved the inventory filed by Martin as executor.

At the time of his death Samuel K. Martin owned real estate in Illinois, and on December 3, 1919, Wilton B. Mar-

tin and the Central Trust Company filed their joint petition in the probate court of Cook county for letters of ancillary administration, and recited in the petition that the property and effects of the deceased in Illinois consisted of personal estate not to exceed in value $50,000, collateral on a loan listed in the New York estate, and real estate not registered under the Torrens act not to exceed in value $20,000, and that the value of the whole estate of the deceased in Illinois did not exceed in value $70,000. On January 5, 1920, letters testamentary were issued to them as ancillary executors and they qualified as such executors.

On December 7, 1919, prior to their appointment as ancillary executors in Illinois, Wilton B. Martin, as New York executor, offered to pay the Central Trust Company the two notes, aggregating $35,000 and interest, provided the trust company would deliver to him the stocks and bonds held as collateral. The trust company refused to accept payment on those conditions, claiming the property was assets of the estate in Illinois and that it should be inventoried by the ancillary executors as such and remain in this State until the end of the year for administration. Martin, on the other hand, insisted that the legal *situs* of the bonds and stocks was New York, where they had been inventoried in the surrogate court. Between December 23, 1919, and May 16, 1920, the controversy between Martin and the trust company as to the *situs* of these bonds and stocks is shown by letters between them, and letters between them and William W. Dixon, attorney for the estate in Illinois. On January 10, 1920, Martin in a letter to the trust company stated that he had carefully considered the matter of inventorying these stocks and bonds in Illinois and was of the opinion that the collateral should be returned to the New York estate. He gave his reasons for his opinion and urged the trust company to deliver the stocks and bonds to the New York estate. In a letter of January 12, 1920, the trust company, in answer to Martin's

letter of the 10th, stated that, inasmuch as the questions were entirely legal, it was referring the questions to its attorney, Dixon, for his opinion. On the same day the trust company wrote to Dixon stating the facts, and asked his opinion as to whether or not the collateral should be delivered to Martin, as New York executor, upon payment by him of the notes. No answer to this letter appears in the record. On February 7, 1920, Dixon wrote Martin in answer to a letter to him from Martin dated February 5, in which Dixon advised Martin that the property held by the trust company as collateral should be considered as a part of the estate in Illinois and that Martin and the trust company should jointly file an inventory of it in the probate court of Cook county. He stated that this question had been settled and numerous decisions rendered on the point. He also advised Martin that the inventory was due in that month, and requested Martin to sign the inventory which had been prepared by the trust company and return it to him for filing. It seems that Martin did not fully understand the letter to him from Dixon, and on February 16, 1920, wrote him to that effect. Dixon replied on the 20th, and stated that the Illinois law was that the property should be retained in Illinois by the co-ancillary executors until the close of the administration year, and cited the case of *Coombs* v. *Carne,* 236 Ill. 333, as authority for his conclusion. He again urged Martin to join with the trust company in signing the inventory prepared by the trust company. March 31, 1920, the trust company wrote Martin again urging him to sign the inventory, and stated that unless he did sign it by April 5 it would be obliged to file it signed only by itself, but desired Martin to sign it also to avoid explaining the situation to the court. Martin replied on April 2 that he had told Dixon that he could not consent to sign it because he did not think the property was Illinois property but believed it was New York property. He also stated that the case submitted as authority for the

position of the trust company was not in point because the question of collateral was not involved. He asked Dixon to submit the question to the court for decision and notify the trust company. He also stated that the position of the trust company was causing the estate to pay interest to it when the estate was amply able to pay the loan. April 5 the trust company wrote Martin again that it saw no escape from the obligation of the executors to file an inventory in Illinois of the collateral, and again stated that unless Martin signed the inventory it would be filed without his signature. April 8 Martin wrote again to the trust company that since they could not agree on the question he had asked Dixon to submit the question to the court for a ruling, and if the court decided the trust company was right he would drop the matter and sign the inventory. The trust company wrote Martin on April 21, 1920, that the question had been submitted to Judge Horner, of the probate court, and he had directed that the property be inventoried in Illinois. The question was not submitted to Judge Horner but to one of his assistants.

Martin finally signed the inventory, and it was filed April 27, 1920. It contained notations made by Martin below his signature, as follows: "The stocks and bonds listed herein are, I believe, a part of the New York estate of Samuel K. Martin and are not part of the Illinois estate. They were sent by Mr. Martin to bank here to secure his notes. The money borrowed by him from bank went to New York into his business there and the interest on his notes was paid from New York. Mr. Martin left no personal property in Illinois and did leave all his personal property in New York, where it is all included in his estate there, including above collateral. Therefore I believe the above collateral is not free property left by Mr. Martin in Illinois but is attached property belonging to New York, which was his residence and place where his original will was filed. I believe the present market value of above col-

lateral is $35,000. New York executor wants to pay above notes provided he gets the collateral. Can we surrender the collateral to him if he does pay the notes?" The record also shows that the deceased never owed any debts in Illinois except the notes to the Central Trust Company.

On March 14, 1921, the Central Trust Company, as co-ancillary executor, filed its final report in the probate court of Cook county and offered to deliver to Martin the securities if he would consent that the report and accounting be approved. This Martin refused to do. The trust company, as co-ancillary executor, never had anything to do with the real estate except to join Martin, as co-ancillary executor, in stating in their petition for letters of administration that the deceased owned the real estate and in inventorying it as part of the assets of property owned by him at his death. In its final report the trust company charges itself with the certificates of stocks and bonds at their par value, amounting to $47,500; also with $625 of dividends and interest collected by it on certificates of stocks and bonds as a holder of the two notes and not as executor, and also with $1475 collected by it as executor for dividends and interest on certificates of stocks and bonds, the total interest and dividends amounting to $2100. It credited itself with the following disbursements: Two dollars each to three appraisers of the estate; $10 to a guardian *ad litem* for services rendered in filing answers for minors *in re* probate of will of the deceased by the co-ancillary executors; $2 to the court reporter for taking proof of heirship; $4 for advertising and posting notice; $50 to the clerk of the probate court in full of court costs; $3.50 for advertising notice for final settlement of the estate; $25 for services of a guardian *ad litem* for minors for examination of final accounts; $1100 to itself for fees for acting as co-executor, making a total credit of $1200.90. The report further shows that the trust company turned over to Martin, the New York executor, the actual certificates

of stocks and bonds, and credits itself with that amount as "disbursements." It shows a balance in the hands of the trust company of $899.10. The evidence further shows that the market values of the securities aforesaid on April 15, 1923, were as follows: Of the Metropolitan Gas and Electric Company, $18,000; of the Union Gas and Electric Company, $8000; of the five bonds of the Pine Bluff and Western Railroad Company, $4900; of the five bonds of the Michigan City Gas and Electric Company, $4750; of the five bonds of the Galveston, Harrisburg and San Antonio Railroad Company, $4850,—a total valuation of $40,500; and that the market value of each security was greater on said date than at any time between that date and December 19, 1919.

A hearing was had on the final report in the probate court on December 15, 1921, and that court approved it. On the appeal to the circuit court the hearing on the final report and the hearing on the case in trover were set for the same day. Martin filed a petition in the probate court stating that the time for filing claims against the estate had expired and that none had been filed, and asked that the Central Trust Company be ordered to turn over to him, as New York executor, the stocks and bonds. On July 6, 1923, the probate court heard the motion and entered an order directing the trust company to turn over to Martin, as New York executor, the certificates of stock and bonds. Thereafter, on the same day, the circuit court entered an order dismissing the suit in trover on motion of the New York executor. On July 18, 1923, the circuit court approved the final report of the trust company, and on the hearing thereon, in addition to the foregoing facts, heard the testimony of Lloyd R. Steere, an attorney and financial agent, who testified in substance as follows: The charge made by the trust company for its fee as co-ancillary executor, which is a little under three per cent of the personal property inventoried in the estate, is the usual and custom-

ary charge for executor's and attorney's fees for that size of estate. There is a custom in the probate court of Cook county to allow a fee, not to exceed three per cent, on estates less than $50,000, which includes the attorney's fees. Where the estate exceeds $300,000 there has been an unwritten understanding that two per cent should cover the fees of the executor and the attorney. He has had many estates approved for fees aggregating five per cent for attorney's and executor's fees where there was as much as $100,000 in the estate, but there was more work in those cases than in this case.

Three questions for decision are presented to this court by the record: (1) Whether the certificates for corporate stocks and the bonds owned by the deceased, a non-resident, and pledged to the Central Trust Company as collateral for the notes aforesaid, should have been inventoried as property in this State; (2) whether plaintiff in error is estopped to raise that question after petitioning for the appointment of co-ancillary executors and joining in the filing of the inventory; and (3) whether or not the allowance of $1100 to the trust company for its fees as co-ancillary executor, including its attorneys' fees, is reasonable and supported by the evidence in the record.

This court held in *Davis* v. *Upson,* 230 Ill. 327, and in *Cooper* v. *Beers,* 143 id. 25, that bonds of a non-resident in this State are nothing more than debts, and that the property in such bonds followed the person of the owner and in contemplation of law was situated at the domicile of the owner. Under those decisions the *situs* of bonds was in the State where the owner resided. That was the law of this State until 1909, when the legislature amended section 10 of the Wills act by adding to that section these words: "For the purpose of granting administration of both testate and intestate estates, the *situs* of specialty debts shall be where the instrument happens to be, and of simple contract debts and other choses in action where the debtor

resides." It is the universal policy of our law to preserve local assets for the satisfaction, in the first instance, of local claims. (*Coombs* v. *Carne, supra;* 18 Cyc. 1229.) Section 10 of the Wills act was evidently passed for the sole purpose of further protecting local creditors living in this State in the collection of their debts against non-resident deceased debtors. It was not passed with a view of compelling administration of estates of non-residents by executors or administrators in cases where the non-residents owe no debt in this State and where such administration is unnecessary. Although the purpose of our Administration act is to facilitate the early settlement of estates, it is not always necessary. It is competent for all the heirs of the deceased person, if they are of age, to settle and pay the debts of the deceased and divide the property among themselves without the intervention of any administration whatever, and neither a debtor nor a creditor has a right to complain. (*VanZanten* v. *VanZanten,* 269 Ill. 491; *Headen* v. *Cohn,* 292 id. 210; *Anderson* v. *Shepard,* 285 id. 544; *Cotterell* v. *Coen,* 246 id. 410; *Moore* v. *Brandenburg,* 248 id. 232.) In this case there was a necessity for the probation of the will of the deceased under our Uniform Foreign Probate act for the purpose of showing a record title to the real estate. The Central Trust Company had a right to demand administration for the purpose of enforcing the collection of its debt if it was not sufficiently secured and protected by the collateral deposited with it but not for the mere purpose of earning executor's fees. Both co-ancillary executors joined in petitioning the court for letters of administration, and as that is so, all questions as to the right or necessity of an administration must be considered as settled. Therefore the only questions for the consideration of this court are as above stated.

The bonds aforesaid are specialty debts within the meaning of section 10 of the Wills act. They were in Chicago in this State at the time the testator died, and it does not

matter how they "happened" to be there at that time as under the statute their *situs* for the purpose of administration is in Illinois. The word "specialty," in its technical signification, imports an instrument under seal for the payment of money. (*Barrett* v. *Hinckley,* 124 Ill. 32; *Webster* v. *Fleming,* 178 id. 140; *Streeter Co.* v. *Janu,* 96 N. W. (Minn.) 1128; *Elasser* v. *Haines,* 18 Atl. (N. J.) 1095; *Beekman* v. *Hamlin,* 24 Pac. (Ore.) 195; *Halnon* v. *Halnon,* 55 Vt. 321; *Lane* v. *Morris,* 10 Ga. 162; 2 Blackstone's Com. 282.) As the bonds were specialty debts and were in Illinois at the time the testator died they were properly inventoried as property belonging to the estate in Illinois.

The certificates for the corporate shares of the two holding corporations are merely the paper representation of incorporeal rights of Samuel K. Martin to the stocks of the corporations. The act of subscribing for the shares gave him title to them, and the certificates merely afforded him evidence of his right and stood on the same footing as other muniments of title. They give only a right to dividends and an interest in the capital of the corporations. (4 Thompson on Corp. secs. 3455, 3465-3490; *Wemple* v. *St. Louis, etc. Railroad Co.* 120 Ill. 196; *Sherwood* v. *Illinois Trust and Savings Bank,* 195 id. 112; *First Nat. Bank* v. *Smith,* 65 id. 44; *Kellogg* v. *Stockwell,* 75 id. 68; *Lakewood Gas Co.* v. *Smith,* 51 Atl. (N. J.) 152; *Bridgmor* v. *Keokuk,* 33 N. W. (Iowa) 355.) Since the certificates are only evidences of the ownership of the shares, the interest or property represented by the shares is held by the company for the benefit of the owner of the certificates. As the habitation or domicile of the corporations is and must be in the State that created them, the property represented by the certificates is deemed to be held by the corporations within the States whose creature they are, and the majority of courts hold that the *situs* of shares of stock in a corporation is in the State in which the corpo-

ration is organized. (*Jellenik* v. *Huron Copper Mining Co.* 20 Sup. Ct. 559; *Holmes* v. *Camp,* 114 N. E. (N. Y.) 841; *Baillie* v. *Columbia Gold Mining Co.* 166 Pac. (Ore.) 965; *Troll* v. *Third Nat. Bank,* 211 S. W. (Mo.) 545; *Warrior Coal Co.* v. *National Bank,* 53 So. (Ala.) 997; *Gamble* v. *Dawson,* 120 Pac. (Wash.) 1060.) In cases of administration it has been held that the *situs* of certificates of corporate stock is in the State of incorporation for the purposes of administration. (*Grayson* v. *Robertson,* 25 So. (Ala.) 229; *Richardson* v. *Busch,* 95 S. W. (Mo.) 894.) Some jurisdictions hold that the *situs* of corporate shares is at the domicile of the owner of the shares, (*Miller's Estate* v. *Executrix,* 136 Pac. (Kan.) 255,) but in no case, so far as we have been able to ascertain, has it been held that the *situs* of certificates of shares of corporate stocks is at the place where the certificates happened to be.

It is argued by defendant in error that since the two holding corporations maintained their offices, transacted all their business and maintained their sole transfer agent at Chicago, and only held stockholders' meetings in Delaware, the State of their incorporation, the domicile of the companies should be considered as in Illinois. The rule as to the domicile of holding corporations and the *situs* of their corporate shares does not differ from the rule as to other corporations. A stockholder in a holding corporation is not a stockholder in the companies whose stock is owned by the holding company, but the interest of such stockholder in the holding company is similar to the interest of any other stockholder. (*Sabre* v. *United Traction Co.* 225 Fed. 601.) The principle that the habitation or domicile of a corporation and the *situs* of its corporate stocks are in the State of its incorporation is not affected by the fact that its business and offices are conducted and located in another State or that its books, records and transfer agents are in another State. (*Jellenik* v. *Huron Copper Mining Co. supra.*) The certificates for the corporate

shares had no *situs* in Illinois for the purpose of administration, and they should have been omitted from the inventory.

There is absolutely no ground for the assertion that plaintiff in error was or is estopped to question the inventory of the certificates of stock as assets in Illinois for the purposes of administration. The facts set out in the petition are very full, and they completely answer every claim of defendant in error of an estoppel of any character. It is several times stated by the defendant in error that the petition for letters ancillary stated that the stocks and bonds were assets in Illinois. We have set out every fact stated in the joint petition filed by the ancillary executors, and there is no statement anywhere therein that the certificates of stocks or the bonds were assets in Illinois. They set out in this petition the exact facts that the certificates and bonds were in this State as collateral security for the debt of the Central Trust Company and that they were inventoried by the New York executor as assets for the purpose of administration in that State, but there is no statement or intimation therein that they were assets for the purpose of administration in this State. The trust company was advised by the New York executor from the very beginning that he did not consider either the bonds or the certificates as assets for administration in Illinois. He endeavored to pay off the debts to the trust company before they filed their inventory and get possession of the bonds and certificates as New York executor before the inventory was filed by them, and ever since that time it has been his claim that they were not assets for administration in Illinois. He has also resisted at all times the inventorying of the securities as assets in Illinois, and the trust company, as owner and as executor, has been advised of his position from the very beginning of the administration, and he did everything in his power to get possession of the securities as New York executor and was resisted at every turn.

Section 133 of our act on administration of estates provides that executors and administrators shall be allowed as compensation for their services a sum not to exceed six percentum on the amount of personal estate and not exceeding three percentum on money arising from the sale of real estate, with such additional allowances for costs and charges in collecting and defending the claims of the estate and disposing of the same as shall be reasonable. The reasonableness of the commission to an executor depends upon the circumstances of each case. (*Askew* v. *Hudgens,* 99 Ill. 468.) Fees to joint executors should be allowed jointly, unless one waives or relinquishes the right to fees, in which case, if both executors have performed services for the estate, the executor charging fees should be allowed his or its just proportion of the total fees allowable for his or its compensation. The final report filed by defendant in error is of the simplest character, without complications, and is very short. Apparently the probate of the will required as much or more time and expense than the making and the submission of the final report, the expense for which is included in the $1100 charged as fees. If the hearing or hearings on the approval of the report required unnecessary time it was not the fault of plaintiff in error, as he was only exercising his right and his duty to protect the estate against excessive charges. Under our holdings that the certificates of stocks are not assets in Illinois the sum of $1100 as executor's fees is unwarranted, and it is not sustained by the evidence of the witness Steere, whose testimony is, in substance, that the customary, usual and reasonable fee in estates less than $50,000 is not to exceed three per cent, which fee includes the attorney's fee. The highest market value of the bonds proved in this case was $14,500, and the total amount of interest collected on them by the trust company, as holder of the notes and as executor, was $2100, making the total value of the personal assets $16,600. This court, in reviewing cases of this char-

acter, is usually bound as to questions of fact by the findings of the Appellate Court. The exception to this rule is in those cases where the correctness of the finding of the Appellate Court becomes a question òf law. The question in this case is whether or not there is any evidence in the record that supports the finding of the Appellate Court, which is a question of law.

As there is no testimony in the record that supports the order of the circuit court or the finding and judgment of the Appellate Court, the order and judgment of those courts are reversed and the cause is remanded to the circuit court.

*Reversed and remanded.*