Joseph Harris, Appellee, v. Chicago Title and Trust Company, Administrator with the Will Annexed of the Estate of John B. Russell, Deceased, et al., Appellants.

**Gen. No. 32,736.**

Heard in the third division of this court for the first district at the June term, 1928. Opinion filed January 30, 1929.

COOKE, SULLIVAN & RICKS and ALDEN, LATHAM & YOUNG, for Chicago Title & Trust Company, appellant.

CHAPMAN & CUTLER, for Harris Trust & Savings Bank, appellant.

CHARLES MARTIN, for Addressing Machines Securities Company, appellant.

TOWNLEY, WILD, CAMPBELL & CLARK, for appellee; MORRIS TOWNLEY, of counsel.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion of the court.

This case has been consolidated with Gen. Nos. 32,734 and 32,735 for hearing on the same record. There are three appeals perfected by each one of the three defendants from the same decree. While each defendant has filed briefs in support of its appeal, the whole case made by the decree, against all defendants, will be dis-

posed of in this opinion and stand as the opinion of the court in all three appeals.

The case went to a final hearing upon the amended bill and the so-called second amended supplemental bill. The defendant, Chicago, Title and Trust Company, as administrator with the will annexed of the estate of John B. Russell, deceased, filed its answer to the amended and second amended supplemental bill. Defendant, Addressing Machines Securities Company, filed its answer to the second amended supplemental bill, and the defendant, Harris Trust & Savings Bank, filed a general demurrer to the same. The demurrer of the bank was overruled, and the bank electing to stand by its demurrer, the decree in the record was entered against the defendant bank (as confessed), as well as the other two defendants.

The theory of the bill is to enforce a constructive trust alleged to arise from the breach of a confidential relationship between complainant Harris and the deceased John B. Russell. Certain preliminary agreements are referred to in virtue of which Harris and Russell, it is claimed, entered into a joint adventure to purchase and sell at a profit certain shares of the predecessor of Addressing Machines Securities Company, the Addressograph Company. It is contended that these agreements attest the existence of a joint adventure. It is set out in the bill that a joint adventure having been entered upon and a confidential relationship established between Russell and Harris, Russell's subsequent conduct in attempting to eliminate Harris from the adventure constituted a breach of the obligations imposed upon him by such confidential relationship.

It is further alleged in the bill that Russell acquired his knowledge of the Addressograph Company shares, including their value and Duncan's willingness to sell, in virtue of a relationship of trust and confidence which

existed between Harris and Russell; that such relationship was that of partners or joint adventurers, which in equity is a confidential relationship, and that by reason thereof Russell was disqualified on equitable principles from using the information thus acquired at any time for his own benefit and to complainant's detriment, and that the bill by its averments sought to declare and enforce against John B. Russell a constructive trust, growing out of the alleged breach of such confidential relationship.

The answer of Russell filed in his life time is in substance the same as that filed by his administrator in Cook county, which denied that Russell had ever entered upon a joint adventure or any relation with Harris, and further denied that there was at any time a confidential relationship between himself and Harris, and contended that there was no joint adventure and no confidential relationship between them, and that he was therefore justified in buying the stock from Duncan for his own account without reference to Harris.

It is contended by the Harris Trust & Savings Bank and the Addressing Machines Securities Company that John B. Russell at the time of his death was a resident of Pennsylvania; that his will was duly probated in Pennsylvania, and his two sons appointed his executors; that the will was also admitted to probate by the probate court of Cook county, Illinois, and the Chicago Title and Trust Company appointed administrator with the will annexed; that the defendant, Addressing Machines Securities Company, is a corporation existing in virtue of the laws of the State of Delaware, as a holding company; that the final trial of the case was had after the death of Russell upon the pleadings above recited; that the Illinois administrator of Russell, as well as the Harris Trust & Savings Bank,

contends that the legal situs of the stock of the Addressing Machines Securities Company is not in Illinois, and that the trial court had no jurisdiction over such stock in this suit, and that its decree in this regard is a nullity, as it had no power to enforce the same.

The three parties defendant will be respectively referred to in this opinion hereafter as the administrator, the bank and the securities company.

The administrator assigns error and argues for reversal:

1.  That the stock of the securities company not being in Illinois, the title thereto is not in the administrator;

2.  That the Pennsylvania executors cannot be made parties defendant by estoppel or otherwise;

3.  That the amended bill does not set forth a case entitling complainant to relief;

4.  That the evidence does not establish the joint adventure with Russell and complainant;

5.  That complainant's witnesses Brush Ellis, complainant, himself, his son Sanford Harris and Gertrude H. Strain, were disqualified to testify by reason of their interest in the subject matter of the litigation.

The bank and the securities company urge for reversal that the situs of the 7,500 shares of the securities company stock is not in Illinois, but in Pennsylvania, and that the securities company is a corporation under the laws of the State of Delaware as a holding company.

The opinion of the chancellor in rendering his decision and in directing the entry of the decree is found in the record. While that opinion has no place in the record, as it is neither evidence of fact nor law, we have given the same our careful consideration.

The competency of the complainant, his son Sanford Harris and the witness Gertrude H. Strain are chal-

lenged as being within the inhibition of paragraph 2, chapter 51, Cahill's 1927 Illinois Rev. St., which reads:

"No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion, or in his own behalf . . . when any adverse party sues or defends . . . as the executor, administrator, heir, legatee or devisee of any deceased person, or as guardian or trustee of any such heir, legatee· or devisee, unless when called as a witness by such adverse party so suing or defending. . . ."

We think it clear that the complainant Joseph Harris comes within the inhibition of this statute, and that he was clearly incompetent to testify as against the administrator of John B. Russell. It is also clear from the testimony of Sanford Harris, notwithstanding his equivocations and evasions, that he was interested with his father, the complainant, in the subject matter of the litigation, about which he testified at length. So was the witness, Gertrude H. Strain, the confidential secretary to Joseph Harris, who admitted that she had a five per cent interest in the event that the suit was decided in favor of complainant. We therefore hold that the evidence of Harris, his son, and Gertrude H. Strain was improperly received, and will not be considered as evidence by this court in its decision of the case.

The leading witness for complainant, Brush Ellis, was secretary to John B. Russell for nearly five years, and all the facts to which he testified were obtained by reason of that confidential relationship that existed between Ellis and Russell and it is very doubtful, to say the least, whether such testimony would be admissible; as the act of Ellis was a betrayal of the confidence which Russell had imposed in him, but be that as it may, a careful examination of all his testimony would in no way tend to establish a joint enterprise or a joint adventure between Harris and Russell.

The evidence of the foregoing witnesses was received against the objection of the defendants.

The interest of complainant started in his obtaining a written option from Joseph S. Duncan for the purchase of 250 shares of the capital stock of the Addressagraph Company for the sum of $2,500,000. The right under the option was to be exercised on or before August 1, 1923, and the option then provided for the manner of payment. This option was extended to September 15 thereafter. Under this option Harris exerted himself to the best of his ability to comply with its terms, but in this he failed. Thereafter Harris did nothing regarding the matter and the decree of the court proceeds upon the theory of the bill that the option created a joint adventure between the parties and a condition of trust and confidence between them, so that whatever Russell did thereafter in relation to the stock inured to the benefit of Harris as well as himself.

Thereafter Russell in effect acquired the interest in the stock in the Duncan option to Harris. Under the testimony in this case we think it apparent that Harris lost all interest in the subject matter of the option at the expiration date as extended, and all the parties were free to deal with the subject matter as they might see fit, as no obligation of a trust or confidential nature existed between them. So far as Harris having any agreed interest in the enterprise, he tried to procure from Russell a writing setting up his interest, the extent of which he made no claim, which Russell never gave him. Many things were done thereafter which it is unnecessary to recapitulate here.

Among other things it was agreed that there should be an audit of the books of the Addressograph Company, and that was made by the firm of which Perley Morse, a witness for defendant, was a member. The bill for that audit amounted to $18,000. While Harris

claimed to have a one-fourth interest he neither paid nor offered to pay any part of the audit bill. There were other large items of expense in acquiring the stock which Harris never paid nor offered to pay. Complainant in no way made himself liable to pay any money. Harris never did any act in a financial way which would indicate or lead any one to believe that he had or claimed to have any interest in the stock covered by or growing out of the option. He did nothing as an indicium of any proprietary nature.

In the course of the chancellor's opinion he made these observations: "In fact, gentlemen, to me this case is so simple that I eliminate from consideration, as you see I do, the testimony of Joseph Harris and am making little reference to the testimony of Sanford Harris. If I had before me only the testimony of Morse, and nothing else, my finding would be that Harris is entitled to recover. I would then possibly be prompted even to hold that it was a trust *ex maleficio*. Morse's testimony would have justified such a conclusion, but I don't think it is necessary in this case. I rather adhere to the first possibility that I have indicated, namely, that without intending to eliminate Harris, so far as Russell was concerned, he intended to make a deal with the view of sharing with Harris in the enterprise. It may be that in his mind he never was clear as to what Harris' share would be, but that does not leave Harris at the mercy of Russell."

The chancellor scouted the idea that he was relying upon the testimony of the Harrises in the conclusion to which he arrived, but he admits that he took into consideration the testimony of Sanford Harris, and as he had overruled the objections made by defendants to the admission of the testimony of the Harrises, which they contend was in the record before him, from which he made his decision, we must assume that he not only admitted that he did take into consideration

the testimony of Sanford Harris, but that he also heeded that of the complainant Harris in arriving at his decision.

The testimony of the witness, Perley Morse, whose testimony the chancellor designated as sufficient to entitle complainant to recover, we will examine, bearing in mind that he testified as a witness for defendants. He testified that Russell never talked about Harris paying one-fourth of the audit bill; he never mentioned having an agreement with Harris. After Morse had been testifying for some time the court made these remarks:

"This testimony is incompetent and will be stricken out. Negotiations carried on in conformity with an arrangement with Russell and Harris to further the enterprise are competent, but testimony between other persons in the absence of complainant, which cannot be said to have been done on his behalf, especially testimony antagonistic to his interests, if any, is hearsay."

After discussion between counsel the chancellor said he would hear the testimony and if it appeared that the negotiations were carried on in pursuance of the joint enterprise it would remain, and that if it was done with a view to terminating the interest of Harris he would strike it out.

And the chancellor further said: "I have decided to change my ruling on the offered testimony of Mr. Morse and I am going to let him testify as to the conversation that took place at the hotel and the testimony stricken out will be reinstated."

Morse further testified that his firm's bill for the audit was $18,000; that he never knew that Harris claimed he was liable for any part of the bill; that Joseph Harris did nothing towards financing the litigation; that the litigation cost the purchasers about $250,000, including court costs, attorneys' fees, experts'

fees and everything. Sanford Harris paid no part. The entire expense was borne by Russell, Woods and Morse and the Addressing Machines Securities Company. The individuals contributed money to the Addressing Machines Securities Company, which paid a great many of these liabilities, and was credited to the individuals by the company; that he never knew at any time that Joseph Harris was a coadventurer with him in the enterprise and never heard, before the bill was filed, that he claimed the parties were carrying him for a one-quarter interest. He never made such a claim to him. Harris, the complainant, never paid or offered to pay any interest accruing to Duncan during the litigation. Complainant never transferred to Russell or to the witness any rights he had under the contract with Duncan.

Then the chancellor, interrupting took over the examination of Morse and catechised him for about eight pages of the record.

In answer to questions by the chancellor Morse testified that he first heard of Harris' option.in August, 1923. Russell brought him some figures regarding the financial condition of the Addressograph Company, and asked him to look over the statement, and he compiled some figures which he gave to Russell. He had known Russell for many years and they had dealings together. Russell told him about this deal, but nothing was said about whether he was to come into it, until the time that the question of this option came up that Russell and he finally obtained, and it was just a verbal understanding that he was to come in with Russell, he to have one-half and Russell one-half, and later Woods came in and they divided it into thirds. This arrangement was subsequent to his sending his men out to make the audit. His men first came to Chicago on August 16th, and did not return until September 25, 1923. He should say Russell and he reached the understanding

about September 16 or 17, 1923. The conference with Russell and the Harrises was about September 14, 1923.

The court then asked this question: "Well, at that time, you had already had some talk with Russell wherein your possible interest would be thus considered? A. Nothing definite."

Question by the court: "But you had some talk? A. Well, on the general confidence between Russell and me. It was not discussing at all. Q. It was your understanding that you were acting as much for yourself as for Russell in the matter although the division was not agreed upon, is that right? A. Well, I would not say that, because I was not satisfied that we could do anything with this thing, at the time of that conference with Mr. Hall, unless we could get his coöperation. Q. Well, if something was accomplished by Russell from the negotiations, it was understood between you, was it, whether the result of direct conversation or otherwise, that you and Russell were to go into this jointly in some form or other? A. Why, I had a feeling, Judge, that if I took part in it I was going to have some part in the compensation if there was any, but there was not any definite understanding until, I think, after we got back to New York, or it may have been on the train going back to New York. I think Mr. Russell went back on the train with me. Q. It was then the terms were discussed whereby you reached some understanding that you were each to have an equal half? A. Yes, somewhere around that time. Q. Was the matter of Harris' interest at all discussed at that time? A. No more than Mr. Russell thought, and I thought, that the Harrises were out of it, because Mr. Duncan had shown himself as being very much opposed to having anything further to do with them."

At this point Mr. Townley said: "I think the Court ought not to allow him to say what he thought. He should say what he said."

The court: "Strike out the answer."

Question by the court: "I want to know whether Harris' interests were discussed at all between you at that time. A. Yes, Mr. Russell said to me he thought that the Harrises were out of it, and I think I said that to him. Q. Did you state why you thought he was out of it? A. Yes, on account of the way Duncan had acted towards them, and little things that he had said, that is what prompted me to go to Mr. Duncan. Q. Well, up to the time of the things that were said or done by Duncan that caused you to believe that he was not satisfied with Harris, did you believe that Harris had some interest in it? A. Why, I was told by Mr. Russell that Mr. Harris had an option, though I had never seen it. Q. Was anything told to you by Mr. Russell, just how Harris, or to what extent Harris contemplated sharing the option with Russell? A. I can give you my conclusion, I don't know that it is worth anything." The court: "I want to know whether anything was said. A. There was nothing said by Mr. Russell and I don't know that there was anything said by Mr. Harris, because they had been friends for years."

Mr. Townley: "I object to what—"

The court: "That part—I don't want your conclusions or your guesses. A. They are not guesses. I know both these gentlemen very well. Q. I want to know if anything was said by Russell to you. A. Regarding any understanding? Q. Regarding any understanding between him and Harris for the division, for the participation of each or either in the benefit of that option, if it were to be exercised. A. Nothing whatever was said."

At this point the examination of Morse was resumed by Mr. Alden. Morse further stated that it was at the meeting of September 14th that Russell stated that the Harrises had got him out by false representations as

to Hall, after Hall had left the room. Hall said emphatically that he never consented to pooling the stock and after he left Russell told Harmon Harris he had deceived him and that they were out on a wild goose chase and Harmon Harris said Hall was the one that had deceived him and that Hall did actually agree to the pooling. Mr. Russell was angry. Hall did not change his attitude after that meeting, etc.

Thereafter Morse testified that the first $250,000 was paid by Russell, Woods and himself, and the next $250,000 was paid by the three of them in June, 1925. Neither Woods, Russell nor himself, nor the Addressing Machines Securities Company received back any part of the $250,000. The Harrises have not paid anything. Russell never mentioned about Harris having an interest. Russell told Morse he had no agreement with Harris whatever, and that Harris had no interest in the proposition, morally or legally. He told him that after Harris brought suit. All he knew was that Harris had an option. He knew Russell got into the matter through Harris. He knew nothing about Sanford Harris' negotiations with Duncan, or that Sanford and Harmon Harris were negotiating with Hall. He heard no talk between Russell and Harris about the Addressograph matter. He believed then that Harris had an interest in the enterprise and before his option expired and before Duncan refused to renew the option. He never saw the option himself, and never knew its contents. He didn't believe that after Duncan refused to renew the option, Harris had any legal or moral right to claim any interest in the option. He understood the option expired September 15th. Russell did not tell Duncan that he was in a joint adventure with Harris to buy the stock, did not say that Harris was interested with him. Russell asked Duncan if he was going to renew the Harris option. Duncan said he would not renew it, and that he did

not want to have anything to do with them, and that under no circumstances would he have anything to do with them.

After Duncan said he was through with the Harrises they opened negotiations for an option. "Russell never said a word to me about Harris paying one-fourth of the audit." The witness never knew that Harris was responsible for any part of the audit. They never asked him to pay. Russell and the witness talked over the proposition and both thought that Harris had reached the end of his rope so far as his option was concerned, and that Duncan would not have anything more to do with him. They considered at that time that the Harrises had lied to them about the entire proposition.

Thereupon the chancellor takes the witness in hand once more, and in answering the interrogatories by the court Morse testified:

Up to the point where he felt that Duncan had become disgusted with the Harrises he assumed that they were in on the deal. There was no understanding. Russell and Harris had been friends for years and he had been friends for years with them. About the time they organized the Addressing Machines Securities Company it was necessary to state their interests. They talked about the expenses each one had been to; he had an item of $18,000, Russell had certain expenses which he told about and Woods had certain expenses which he told about, and it was agreed that the expenses should be charged to the proposition and they should receive credit on the books of the securities company. Russell said there was one thing he would like to have; that he was mindful of the fact that the Harrises brought this option to him in the first place, even if they did fall down, and on account of his long friendship and regard for "Pop" Harris he would like to include in his personal expenses about $15,000, and not to exceed $25,000 based on the amount of

money made here, because at that time they did not know whether they were going to make any money or not, and Woods, Russell and he agreed that they would do that. "That is the inside of it and all there is to it, Judge." Russell thought the world of Harris. He knew of nothing from which the court could see what was in the minds of the parties as to the extent of the interest the Harrises were to have if the negotiations succeeded, before Duncan had become disgusted. What he has just told you is the first he heard of any interest which Russell wanted to give to the Harrises, and that was a pure gift on account of friendship. They never considered the Harrises had any real interest at that time. Between September 10th and September 14th, there was nothing said in any way as to the interests of anyone. At that time they considered the Harrises interested. As to the respective interests that was not thought of.

Then the examination of Morse was resumed by Mr. Alden. Morse further testified: Russell said he was not obligated to the Harrises, but on account of the long friendship for Harris he would like to make him that present and they consented. That was to be put in as a part of Russell's expenses and assumed by the Addressing Machines Securities Company and paid by that company to Russell.

The foregoing testimony of Morse is recited for the purpose of showing the inconsistency of the conclusion of the chancellor that Morse's testimony, if nothing else were in the record, was sufficient to sustain the claim and contention of complainant. All of the counsel taking part in the trial before the chancellor were able, experienced trial lawyers, well able, as they did, to take care of every interest of their respective clients. The aid of the court, as counsel, was not sought by either of them. The long and extended cross questioning of the witness Morse, we cannot refrain from concluding,

evidenced a strong partisan feeling and attitude on the part of the chancellor. He thereby assumed the rôle of an advocate, which was hardly judicial.

It is our conclusion that the admissible testimony found in the record is utterly insufficient to support the conclusions to which the chancellor arrived, as evidenced by his opinion and the decree entered in accord therewith.

The *res* involved in this litigation is 7,500 shares of the stock of the securities company, which Russell in his lifetime acquired and in which the decree awarded to complainant a one-half interest, being 3,750 shares, subject to the payment of certain expenses incurred by Russell in the acquisition thereof.

The question now left for our disposition is the jurisdiction of the court to make a decree affecting such shares of stock. The question is one of law arising upon the facts stipulated by the parties into the record. The case had been partially tried in the lifetime of Russell. After his death the administrator in Cook county was made a party in the place of Russell, deceased, and complainant filed an amended bill and a second amended supplemental bill upon which pleadings he prosecuted his cause. The securities company filed its answer and the bank demurred, as heretofore stated, and on the overruling of its demurrer elected to stand by its demurrer, and thereupon the bill and the second amended supplemental bill were taken as confessed against it.

By stipulation of the parties dated February 16, 1928, the following facts were agreed upon, subject to the right of objection on the ground of competency and materiality.

That Russell in his lifetime was indebted to the bank in the sum of $80,000, and on January 13, 1927, executed and delivered his promissory note to the bank for that sum, bearing interest at 5 per cent from date,

and at the same time indorsed in blank and deposited with the bank among other things 7,500 shares of the stock of the securities company, which were held as collateral security by the bank; that the interest was paid to September 30, 1927; that the certificates of stock are now held by the bank; that the securities company is a Delaware corporation, licensed to do business in Illinois, maintaining an office in Illinois for the transaction of its business and its books, including transfer books, are kept in Illinois; that it is a holding company and has transacted no business in Delaware except its organization meeting, and all its business has been transacted in Illinois, except occasional directors' meetings in New York, and it is not licensed to do business outside of Illinois and Delaware; that Alden, Latham & Young, one of the firm of solicitors of record for the administrator, prepared and filed for the Pennsylvania executors the petition in the probate court of Cook county, upon which the Illinois administrator was appointed; that subsequently said firm represented the Illinois administrator in the trial of the cause, and that Joseph E. Russell and John B. Russell, Jr., mentioned in paragraph 1 of the second amended supplemental bill, were in court during the trial of the cause and rendered such assistance as was required of them; that the petition for letters filed in the probate court, referred to in paragraph 1 of the second amended supplemental bill, alleged that Russell was a resident of Luzerne county, Pennsylvania, at the time of his death, and the order of the probate court of Cook county found that the last will of Russell had been duly proven and admitted to probate in Pennsylvania.

It was further stipulated that with respect to paragraph 8 of said second amended supplemental bill, the facts are that subsequently counsel for defendant advised counsel for plaintiff that he would contend that said shares of stock of the securities company had no

situs in Illinois, and were not subject to any decree which the Cook county court might make in the cause.

None of the foregoing facts is in dispute.

The question is therefore squarely presented under the undisputed facts, whether the court erred in holding that the situs of the stock of the defendant securities company is in Illinois, so that the title thereto vested in the Illinois administrator, and whether the court erred in decreeing that 3,750 shares of such stock, subject to certain charges, was the property of complainant. The Pennsylvania executors were not parties to the case at bar, and if they had been parties, they could not have been brought into the jurisdiction of the court. *Elting v. First Nat. Bank of Biggsville,* 173 Ill. 368.

In *Flexner v. Farson,* 268 Ill. 435, it was held that every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory, but that no State can exercise direct jurisdiction over persons and property not within its territory.

The *dicta* of our Supreme Court find support in *Brown v. Fletcher's Estate,* 210 U. S. 82.

It is seldom in judicial history that two cases are presented to a court which are so on all fours with each other as this case and *Martin v. Central Trust Co.,* 327 Ill. 622. Every material element in this case was in the *Martin* case, and this case is controlled by the reasoning in the *Martin* case. Counsel for Harris have made a very ingenious argument in an effort to differentiate the *Martin* case from that of their client. While the argument is interesting, it is not persuasive. The *Martin* case is not one which involved simply the legal fee of the coancillary executor. The whole case rested and was decided upon the question of the situs of the stock which was an asset of the estate and in the possession of Wilton B. Martin, as executor of Samuel K. Martin, a resident of New York, and under

whose will Wilton B. Martin was appointed executor by the New York surrogate court. That situation is analogous to the one at bar. Russell was a resident of Pennsylvania at the time of his death and domiciled there, and his will was there admitted to probate, and letters testamentary granted to his sons. In the *Martin* case 225 shares of the preferred stock of the Metropolitan Gas and Electric Company, a Delaware corporation, and 100 shares of the first preferred stock of Union Gas and Electric Company, likewise a Delaware corporation, were involved. In the case at bar 7,500 shares of the securities company stock, a Delaware corporation, are the subject matter of this litigation. The Martin stock was held by the Central Trust Company as collateral security for an indebtedness of the deceased Martin in the sum of $24,000. A like situation is found in the case at bar. Wilton B. Martin, the New York executor, offered to pay the notes providing the trust company would deliver the stock to him. The trust company refused to accept payment on the condition named claiming the property as an asset of the estate in Illinois, and that it should be inventoried as such by the ancillary executors, and remain in the State until the end of the year for administration. Martin, on the other hand, insisted that the legal situs of the stock was New York, where it had been inventoried in the surrogate court. Martin told the trust company that it was his opinion that the collateral should be returned to the New York estate. The questions raised in the *Martin* case are the same in effect as those raised here, as to whether the certificates for corporate stock owned by the deceased, a nonresident, and pledged to the Central Trust Company as collateral for the notes of the deceased Martin, should have been inventoried as property in this State; and second, whether the plaintiff in error is estopped to raise that question after petitioning for the appointment of a

coancillary executor and joining in the filing of the inventory. And the court cites *Davis v. Upson,* 230 Ill. 327, and *Cooper v. Beers,* 143 Ill. 25, holding that bonds of a nonresident in this State are nothing more than debts, and that the property in such bonds followed the person of the owner, and in contemplation of law was situated at the domicile of the owner. Under these decisions the situs of the bonds was in the State where the owner resided. That was the law of this State until 1909, when the legislature amended section 10 of the Wills Act, Cahill's St. ch. 148, ¶ 10, by adding to that section the following words: "For the purpose of granting administration of both testate and intestate estates, the situs of specialty debts shall be where the instrument happens to be, and of simple contract debts and other choses in action where the debtor resides." But the court further held that the amendment "was not passed with a view of compelling administration of estates of nonresidents by executors or administrators in cases where the nonresidents owe no debt in this State and where such administration is unnecessary"; and likewise held: "The Central Trust Company had a right to demand administration for the purpose of enforcing the collection of its debt if it was not sufficiently secured and protected by the collateral deposited with it."

The court further said:

"Since the certificates are only evidences of the ownership of the shares, the interest or property represented by the shares is held by the company for the benefit of the owner of the certificates. As the habitation or domicile of the corporations is and must be in the State that created them, the property represented by the certificates is deemed to be held by the corporations within the States whose creature they are, and the majority of courts hold that the *situs* of shares of stock in a corporation is in the State in which the corporation is organized. (*Jellenik v. Huron Copper Min-*

*ing Co.,* 20 Sup. Ct. 559; *Holmes v. Camp,* 114 N. E.
(N. Y.) 841; *Baillie v. Columbia Gold Mining Co.,* 166
Pac. (Ore.) 965; *Troll v. Third Nat Bank,* 211 S. W.
(Mo.) 545; *Warrior Coal Co. v. National Bank,* 53 So.
(Ala.) 997; *Gamble v. Dawson,* 120 Pac. (Wash.)
1060.) In cases of administration it has been held that
the *situs* of certificates of corporate stock is in the
State of incorporation for the purposes of administra-
tion. (*Grayson v. Robertson,* 25 So. (Ala.) 229; *Rich-
ardson v. Busch,* 95 S. W. (Mo.) 894.) Some jurisdic-
tions hold that the *situs* of corporate shares is at the
domicile of the owner of the shares, (*Miller's Estate
v. Executrix,* 136 Pac. (Kan.) 255,) but in no case, so
far as we have been able to ascertain, has it been held
that the *situs* of certificates of shares of corporate
stocks is at the place where the certificates happen to
be.''

In the *Martin* case it was argued, as here, that since
the holding corporations maintained their offices and
transacted business and maintained their sole transfer
agents at Chicago, and only held stockholders' meet-
ings in Delaware, the state of their incorporation, the
domicile of the companies should be Illinois. Answer-
ing this contention the court said:

''The rule as to the domicile of holding corporations
and the *situs* of their corporate shares does not differ
from the rule as to other corporations. A stockholder
in a holding corporation is not a stockholder in the
companies whose stock is owned by the holding com-
pany, but the interest of such stockholder in the hold-
ing company is similar to the interest of any other
stockholder. (*Sabre v. United Traction Co.,* 225 Fed.
601.) The principle that the habitation or domicile of
a corporation and the *situs* of its corporate stocks are
in the State of its incorporation is not affected by the
fact that its business and offices are conducted and lo-
cated in another State or that its books, records and

transfer agents are in another State. (*Jellenik v. Huron Copper Mining Co. supra.*) The certificates for the corporate shares had no *situs* in Illinois for the purpose of administration, and they should have been omitted from the inventory.''

And on the question of estoppel raised in the *Martin* case as in the instant case, the court said:

''There is absolutely no ground for the assertion that plaintiff in error was or is estopped to question the inventory of the certificates of stock as assets in Illinois for the purposes of administration. The facts set out in the petition are very full, and they completely answer every claim of defendant in error of an estoppel of any character. It is several times stated by the defendant in error that the petition for letters ancillary stated that the stocks and bonds were assets in Illinois. We have set out every fact stated in the joint petition filed by the ancillary executors, and there is no statement anywhere therein that the certificates of stocks or the bonds were assets in Illinois. They set out in this petition the exact facts that the certificates and bonds were in this State as collateral security for the debt of the Central Trust Company and that they were inventoried by the New York executor as assets for the purpose of administration in that State, but there is no statement or intimation therein that they were assets for the purpose of administration in this State. The trust company was advised by the New York executor from the very beginning that he did not consider either the bonds or the certificates as assets for administration in Illinois. He endeavored to pay off the debts to the trust company before they filed their inventory and get possession of the bonds and certificates as New York executor before the inventory was filed by them, and ever since that time it has been his claim that they were not assets for administration in Illinois.''

This reasoning is peculiarly applicable to the contention in the instant case and decisive as against complainant's contentions.

We therefore hold that the 7,500 shares of stock in the securities company are not assets in Illinois, and that the title to such stock did not vest in the administrator defendant. It therefore follows that the chancellor erred in not sustaining the demurrer of the bank to the second amended supplemental bill. The situs of the securities company stock not being in Illinois, therefore the court had no jurisdiction to make any order or decree regarding the ownership of the same or to order the distribution thereof. It follows that the circuit court was without jurisdiction to enter the decree it did.

Therefore, for the reasons hereinbefore stated, the decree of the circuit court is reversed with directions to that court to dismiss the bills before it for want of jurisdiction.

*Reversed and remanded with directions.*

WILSON and RYNER, JJ., concur.